UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
MARC BRUH,

                Plaintiff,           03 Civ. 7340 (GBD)

    -against-                      MEMORANDUM
                                                DECISION AND ORDER

BESSEMER VENTURE PARTNERS III L.P.,
and VISTACARE, INC.,
                Defendants.
------------------------------------------------------------x
GEORGE B. DANIELS, DISTRICT JUDGE:

    This action arises out of the automatic conversion of Preferred Stock to Common Stock at the closing of VistaCare, Inc.'s ("VistaCare") initial public offering and the subsequent sale of such stock within six months by Defendant, Bessemer Venture Partners III L.P. ("Bessemer"). Plaintiff, a VistaCare shareholder, sued VistaCare and Bessemer, seeking disgorgement of short-swing profits pursuant to Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) ("Exchange Act"). Defendants counterclaimed, seeking declaratory judgment that the transactions were not subject to Section 16(b) liability, or alternatively, that their transactions were subject to two exceptions that waived liability under Section 16(b). Both Plaintiff and Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff's motion for summary judgment is DENIED. Defendants' motion for summary judgment is GRANTED.

## INTRODUCTION

    VistaCare is a publicly traded company whose common stock is registered with the Securities and Exchange Commission ("SEC"). Plaintiff is a shareholder of VistaCare. Bessemer, a long-term investor in VistaCare, entered into a Stock Purchase Agreement with Vista Hospice Care, Inc. ("VHS"), pursuant to which Bessemer purchased and acquired 305,292 shares of VHS Series A-1 Preferred Stock in 1995.[1] At the time of this purchase, the Preferred Stock was not convertible to

---

[1] Under section titled "Purchase of Shares", the Stock Purchase Agreement states in relevant part:

common stock. In 1998, as part of a recapitalization, VHS became a wholly owned subsidiary of VistaCare, Inc., and VHS Series A-1 Preferred Stock became VistaCare, Inc. A-1 Preferred Stock.

On December 23, 1999, VistaCare filed a Third Amended and Restated Certificate of Incorporation ("Restated Certificate"). Under the terms of the Restated Certificate, upon closing of an initial public offering of VistaCare Common Stock (the "IPO"), VistaCare Series A-1 Preferred Stock would automatically convert to shares of VistaCare Common Stock. The Restated Certificate set forth a specific ratio under which the preferred stock would be converted to common stock:[2]

> Upon the closing of a Qualified Initial Public Offering, each outstanding share of Series A-1 Preferred Stock shall automatically be converted into a number of shares of Class A Common Stock equal to (i) the Original Issue Price of the Series A-1 Preferred Stock (as adjusted for any stock splits, stock dividends, recapitalizations and similar events), plus all accrued but unpaid dividends on such shares of Series A-1 Preferred Stock, divided by (ii) the per share price at which the Common Stock is sold to the public in the Qualified Initial Public Offering (the "IPO Price").

(June 4, 2004, Twersky Decl., Ex. 2).

Bessemer argues that because the ratio was fixed and set at the time of the Restated Certificate, even if it were privy to insider information, it would be unable to alter the ratio to take advantage of the information. It is further undisputed that the value of Bessemer's holding was the same after the conversion because under the formula set forth, an increase in the IPO price per share would lead

---

> 1.1. <u>Number of Shares.</u> On the Closing Date (as specified in Section 5), subject to the terms and conditions hereof and in reliance upon the representations, warranties and agreements contained herein, the Company agrees to sell each Purchaser, and each Purchaser agrees to purchase from the Company, the number of shares of the Company's Series A Preferred Stock, $.01 par value ("Series A Preferred Stock") and the number of shares of the Company's Common Stock, $.01 par value ("Common Stock") set forth opposite the name of such Purchaser on <u>Exhibit A</u> hereto.

(June 4, 2004, Twersky Decl., Ex. 1) (emphasis in original).

[2] This conversion ratio was determined through arms-length negotiation between VHS and Bessemer. (Countercl. at ¶ 15). According to Bessemer, the security that was negotiated in 1995 "provided for cash to be paid to redeem the Series A-1 preferred [stock] on an IPO, and [the majority shareholder] objected to that provision because they thought that ... it was a risk that the company might not have the cash at the time of the IPO." (Kessler Decl. Ex. 7 at 92-93). Bessemer avers that the terms of the conversion were the result of pressure to accommodate VistaCare's majority stockholder. (<u>Id</u>. at 93–96).

to an offsetting decrease in the number of common shares Bessemer would received in the conversion. Bessemer argues, therefore, that the conversion was not a new investment by Bessemer in VistaCare. The conversion's sole effect on Bessemer's holdings was to change its preferred stock into an equivalent value of common stock.

On December 23, 2002, VistaCare completed the IPO of its common stock at a price of $12.00 per share. Pursuant to the terms of the 1999 Restated Certificate, Bessemer's Preferred Stock was converted to 251,865 shares of Common Stock. On May 13, 2003, VistaCare conducted a secondary offering in which certain selling shareholders, including Bessemer, sold additional shares of VistaCare Common Stock to the public at $20.00 per share (the "Secondary Offering"). At all relevant times, Bessemer held ten percent or more of the stock of VHS or VistaCare. Bessemer did not have a position on VistaCare's Board of Directors. Bessemer had no control over the board or management of VistaCare concerning the timing, form, or occurrence of the IPO, or the per-share price to the public of VistaCare common stock.[3]

On June 24, 2003, counsel for Plaintiff demanded VistaCare bring suit against Bessemer seeking disgorgement of the profits Bessemer made from their sale in the Secondary Offering. Plaintiff's counsel asserted that Bessemer's acquisition of Common Stock by conversion of its Preferred Stock at the closing of the IPO constituted a "purchase" for purposes of Section 16(b) liability. By letter dated July 2, 2003, VistaCare asked Bessemer to advise why VistaCare should not be entitled to disgorgement of profits.

On July 31, 2003, Bessemer filed a complaint in the United States District Court for the Southern District of New York seeking a declaratory judgment that Bessemer has no Section 16(b) liability because, among other things, the conversion of VistaCare Common Stock pursuant to the

---

[3]Bessemer offers proof that it urged VistaCare to conduct the Secondary Offering on a later date. This request was rebuffed by VistaCare who went forward with the Secondary Offering in May 2003.

closing of the IPO, should not be considered a "purchase" under the SEC's rules. On September 18, 2003, Plaintiff filed the instant Complaint, seeking "disgorgement of short-swing insider trading profits" allegedly realized by Bessemer. Plaintiff seeks disgorgement of short-swing profits in the amount of $1,725,275.25. On October 9, 2003, Bessemer dismissed its separate declaratory judgment action. Bessemer filed an Answer and Counterclaim in Plaintiff's action on October 17, 2003.

## STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Nebraska v. Wyoming, 507 U.S. 584, 590, 113 S. Ct. 1689, 1694, 123 L. Ed. 2d 317 (1993). The burden of demonstrating that no factual dispute exists is on the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once the moving party has met this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56 (e). In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment should be granted only when no reasonable trier of fact could find in favor of the nonmoving party. Gallo v. Prudential Residential Services, Ltd., 22 F.3d 1219, 1224 (2d. Cir. 1994).

## SECTION 16(b) LIABILITY

Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), which imposes liability for "short-swing" profits, forbids an insider's speculative short-term trading based upon insider information. Its purpose is to prevent corporate insiders from exploiting material information about the issuer to have an advantage over others with whom they trade. Gwozdsinsky v. Zell/Chilmark Fund, L.P., 156 F.3d 305, 308 (2d Cir. 1998). Section 16(b) provides, in pertinent

4

part:

> For the purposes of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . involving any such equity security within any period of less than six months, . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer ... .

15 U.S.C. § 78p(b).

Thus, a claim for disgorgement of profits under Section 16(b) requires that Plaintiff prove that there was (1) a purchase (2) and a sale of securities (3) by a statutory insider[4] (4) within a six-month period.[5] See Feder v. Frost, 220 F.3d 29, 32 (2d Cir. 2000) (quoting Gwozdsinsky v. Zell/Chilmark Fund, L.P., 156 F.3d 305, 308 (2d Cir. 1998)). Section 16(b) is a strict liability statute which applies "irrespective of any intention on the part of such beneficial owner ...." 15 U.S.C. § 78p(b); see also Magna Power Co. v. Dow Chem. Co., 136 F.3d 316, 320-21 (2d Cir. 1998) ("Section 16(b) operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition."); Schaffer v. CC Invs, et al., 280 F. Supp. 2d 128, 133 (S.D.N.Y. 2003) (stating that Section 16(b) "not only prohibited all short-swing trading by an insider within a period of less than six months but did so regardless of whether the insider actually used or even knew of inside information when engaging in the transaction."). Plaintiff argues that Bessemer "purchased" the Common Stock on December 23, 2002, the date of the initial public offering, when Bessemer's Preferred Stock was converted to Common Stock.

Under the Securities Act, the term "'purchase' include[s] any contract to buy, purchase, or otherwise acquire." 15 U.S.C. § 78c(a)(13). The Supreme Court has recognized that the definition

---

[4]Statutory insiders are the " issuer's directors and officers and any persons who own more than ten percent of any class of the issuer's non-exempt, registered equity securities." See Gwozdsinsky, 156 F.3d at 308 n.3 (citing 15 U.S.C. § 78p).

[5]It is undisputed that Bessemer is a statutory insider because it owned more than ten percent of VistaCare, and that Bessemer sold shares of Common Stock at $20.00 per share on May 13, 2003.

of "purchase" applicable to Section 16(b)

> [is] broad, and, at least arguably, reach[es] many transactions not ordinarily deemed a ... purchase. In deciding whether borderline transactions are within the reach of the statute, the courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent–the realization of short-swing profits based upon access to inside information–thereby endeavoring to implement congressional objectives without extending the reach of the statute beyond its intended limits ... . Thus, "in interpreting the term[] 'purchase'..., courts have properly asked whether the particular type of transaction involved is one that gives rise to speculative abuse."

Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 593-95, 93 S.Ct.1376, 36 L.Ed.2d 503 (1973)(quoting Reliance Elec. Co. v. Emerson Elec. Co., 404 U.S. 418, 424 n.4, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972)). The "indices" of speculative abuse require a determination of whether there was access to inside information (distinguishable from the possession of it) and whether the defendant could influence the timing and circumstances of the transactions at issue. See Donoghue v. Casual Male Retail Group, Inc., 375 F. Supp. 2d 226, 231-32 (S.D.N.Y. 2005); Makofsky v. Ultra Dynamics Corp., 383 F. Supp. 631, 638 (S.D.N.Y. 1974) (citing Kern, 411 U.S. at 597-600).

In 1991, the SEC adopted amended rules which considered a "derivative security" as a Section 16(b) purchase. A derivative security is "any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege at a price related to an equity security, or similar securities with a value derived from the value of an equity security." 17 C.F.R. § 240.16a-1. However, "[r]ights with an exercise or conversion privilege at a price that is not fixed" are expressly excluded from the definition of a derivative security. 17 C.F.R. § 240.16a-1(c)(6). Further,

> the exercise of a derivative security, much like the conversion of a convertible security, essentially changes the form of beneficial ownership from indirect to direct. Since the exercise represents neither the acquisition nor the disposition of a right affording the opportunity to profit, it should not be an event that is matched against another transaction in the equity securities for purposes of Section 16(b) short-swing profit recovery.

The profit that can be realized on short-swing transactions, whether accomplished

through derivative securities, the underlying equity security or a combination of both, depends upon the price of the underlying security. While the amount of the profit may vary given factors such as the time value of money and volatility of the underlying stock evidenced in the option premium, the exercise does not change the opportunity to realize a profit. As the price of the underlying common stock increases, so does the value of a call option or similar derivative security with a fixed exercise or conversion price related to the common stock.

Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 28,869, 56 Fed. Reg. 7242, 7249 (Feb. 21, 1991) ("SEC Release").

A derivative security and its underlying equity security are functionally equivalent. See SEC Release at 7248. Moreover, "The establishment of or increase in a call equivalent position or liquidation of or decrease in a put equivalent position shall be deemed a purchase of the underlying security for purposes of section 16(b) of the Act ... ." 17 C.F.R. § 240.16b-6(a). A call equivalent position is "a derivative security position that increases in value as the value of the underlying equity increases, including but not limited to, a long convertible security, a long call option, and a short put option position." 17 C.F.R. § 240.16a-1(b).

In the instant matter, Plaintiff argues that "Bessemer did not own a derivative security in 1999, because the conversion price was not yet fixed, and convertible securities with conversion prices that are not fixed are specifically excluded from the definition of derivative securities. However, once the conversion price became fixed, the Preferred Stock became a derivative security ... ." (Pl. Mem Supp. Mot. Summ. J. at 11-12) (emphasis in original). Therefore, Plaintiff contends that the IPO provided Bessemer with a derivative security as of that date, and established a call equivalent position.

Plaintiff's argument is unavailing. Before December 23, 2002, Bessemer's Preferred Stock had its own independent value. It did not derive its value from any then existing VistaCare common stock. Before the IPO Bessemer held non-derivative Preferred Stock. After the IPO, Bessemer's Preferred Stock became Common Stock. Thus, Bessemer no longer held Preferred Stock, but now held Common Stock equal to its prior Preferred Stock holdings. Consequently, when the conversion occurred on December 23, 2002, no derivative or call equivalent position was established.

7

The "purchase" in the instant matter occurred at the time Bessemer contracted, by signing the Stock Purchase Agreement in 1995, to acquire VistaCare Preferred Stock. That is when Bessemer's rights and obligations became fixed and irrevocable. See T-bar Inc. v. Chatterjee, 693 F. Supp. 1, 5-6 (S.D.N.Y. 1988) (defining a purchase as "when the purchaser 'ha[d] incurred an irrevocable liability to take and pay for the stock and his rights and obligations have become fixed."); Prager v. Sylvestri, 449 F. Supp. 425, 432-33 (S.D.N.Y. 1978) (stating that a purchase is made when the "investor becomes irrevocably committed to the transaction and, in addition, no longer has control over the transaction in any way that could be turned to a speculative advantage by the investor."); Blau v. Ogsbury, 210 F.2d 426, 427 (2d Cir. 1954) (stating that purchase occurred when there is "an irrevocable liability to take and pay for the stock").

In 1999, Bessemer re-negotiated the nature of its holdings from Preferred Stock to Common Stock. While the price of Common Stock was not yet fixed, the conversion ratio negotiated was set to ensure that when the IPO took place the value of the Common Stock would equal the current value of Bessemer's Preferred Stock. Bessemer had no control over the board or management of VistaCare, and thus could not alter the conversion rate previously established in 1999. Further, neither Bessemer, nor any of its partners, officers or agents, had any control over the board or management of VistaCare concerning the timing, form or occurrence of the IPO or the Secondary Offering. In fact, Bessemer urged that the Secondary Offering be delayed, but VistaCare refused. The fact that Bessemer realized a profit from the sale of its Common Stock in 2003 is of no consequence here. There is no indication that Bessemer knew in 1999 the actual date of the IPO, and thus when their Preferred Stock would convert to Common Stock. Even if Bessemer was aware in 1999 the eventual date of the IPO, Section 16(b) "does not strip the insider of all advantage. He may increase or decrease his holdings according to the dictates of his special knowledge. It is only the short-swing transaction which must yield profits to the company alone." Roberts v. Eaton, 212 F.2d 82, 85 (2d Cir. 1954).

Moreover, the Second Circuit has found problematic and rejected the argument, implicitly advanced here by Plaintiff, that "[o]ne can, as a matter of language, describe the conversion of a company's preferred stock into an equivalent amount of common stock as ... an 'acquisition' or 'purchase' of another ... ." Blau v. Lamb, 363 F.2d 507, 517 (2d Cir. 1966); see also Occidental Petroleum Corp. v. Mukamal, 450 F.2d 157, 162 (2d Cir. 1971) aff'd 411 U.S. 582, 590-91 (1973) (discussing dictum in Park & Tilford, Inc. v. Schulte, 160 F.2d 984 (2d Cir. 1947)). The Second Circuit has stated that putting aside the intimations in Park & Tilford, "in deciding whether a certain transaction is a Section 16(b) 'purchase' or a 'sale' it is relevant to first consider whether the transaction in any way makes possible the unfair insider trading that Section 16(b) was designed to prevent." Lamb, 363 F.2d at 518.

In Roberts v. Eaton, 119 F. Supp. 362 (S.D.N.Y. 1953), insiders owned over 45 percent of their company's single class of common stock which was reclassified into a new class of preferred and a new class of common stock. Within six months of the reclassification, the insiders sold their new securities at a profit. In finding that there was no purchase for section 16(b) liability, the District Court stated that "the defendants had owned their stock for several years. The sale cannot possibly come within the provisions of Section 16(b) unless it can be found that they 'purchased' their holdings anew upon reclassification." Id. at 365. The District Court further stated that the "corporate shareholders acquired no additional interest in the corporation as a result of the reclassification. It was merely a division of their existing interest. Each stockholder retained what he had held, all the while, in the same proportion, but in a somewhat different form." Id. In affirming the District Court's holding, the Second Circuit reasoned that the "cumulative effect" of different factors rendered the reclassification of the securities as not speculative abuse and therefore was not a purchase under Section 16(b). See Roberts v. Eaton, 212 F.2d 82, 85-86 (2d Cir. 1954) (cited in Lamb, 363 F.2d at 518) (stating that additional factors included the fact that defendants' interests continued in the same company and proportionally unchanged, other factors included the

9

fact that "time consuming ratification by the stockholders was required, and that the acquisition and proposed sale, was fully disclosed."). In the case at bar, and using the standard articulated in Lamb, none of the possible unfair trading activities that Section 16(b) was designed to prevent is present. Therefore, Plaintiff's contention that the conversion price became fixed on the date of the IPO, and thus that is when Bessemer purchased it's Common Stock, is therefore without merit and must be rejected.

## CONCLUSION

Plaintiff's motion for summary judgment is DENIED. Defendants' motion for summary judgment is GRANTED.[6] This action is dismissed in its entirety.

Dated: New York, New York
August 26, 2005

SO ORDERED:

_____
GEORGE B. DANIELS
United States District Judge

---

[6] Bessemer argues that the complaint should be dismissed because under Rule 16b-7 reclassifications are exempt from Section 16(b) liability, see 17 C.F.R. § 240.16b-7, or in the alternative, the reclassification in question was an "unorthodox transaction" that presented none of the dangers that Section 16(b) was intended to address. Plaintiff counters that Rule 16b-7 is inapplicable and that Bessemer's stock conversion is not within the ambit of the "forced" or unorthodox transaction exception. Because the Court has determined that there is no Section 16(b) liability in the instant matter, it need not resolve whether or not the transactions at issue are otherwise exempted from Section 16(b) liability.

10